IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13–cv–03282–RM–KMT


RICHARD COOK, an individual,
MARY D. COOK, an individual,
RICHARD M. HUGHES, an individual,
JAMES K. LUST, an individual, and
JAMES V. STEWART, LLC, a Washington limited liability company,

      Plaintiffs,

v.

PENSA, INC., a Colorado corporation,
LOUIS W. PENDLETON, an individual, and
EDMUND A. PENDLETON, an individual,

      Defendants.

---

## ORDER

---

      This matter is before the court on "Defendants' Motion and Brief to Compel Arbitration and Stay Proceedings."  (Doc. No. 15, filed Feb. 12, 2014.)  Plaintiffs filed four separate responses to Defendants' Motion on March 10, 2014—James V. Stewart, LLC's Response (Doc. No. 21 [Stewart Resp.]), Richard and Mary Cook's Response (Doc. No. 22 [Cooks Resp.]), Richard Hughes' Response (Doc. No. 23 [Hughes Resp.]), and James Lust's Response (Doc. No. 24 [Lust Resp.].  Defendants' Reply was filed on March 27, 2014.  (Doc. No. 27 [Reply].)  Accordingly, this matter is ripe for the court's review.  For the following reasons, Defendants' Motion to Compel is GRANTED.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant PenSa, Inc. ("PenSa") is an oil and gas exploration company owned by Defendants Lou and Edmund Pendleton (the "Pendletons").  (Am. Compl., Doc. No. 9, ¶ 12.) Beginning in 2003, PenSa and the Pendletons solicited Plaintiffs' investments in various oil and gas exploration projects in which PenSa had a non-operating working interest, including the Treasure Valley Prospect ("TV Prospect") and Treasure Valley North Prospect ("TV-North Prospect") in Garvin and Murray Counties, Oklahoma (collectively, the "Investment Prospects"). (*Id.*¶ 13.)  Ultimately, Plaintiffs each acquired equitable working interests in the Investment Prospects from PenSa as follows.  (*Id.* ¶ 20.)

### A.    *Plaintiff James V. Stewart LLC*

James Stewart, the principal member of Plaintiff James V. Stewart, LLC (hereinafter, referred to as "Stewart"), was solicited by the Pendletons and their father, Ed Pendleton, to acquire a working interest in the TV Prospect.  (Stewart Resp. at 3.)  Ultimately, Stewart invested a total of approximately $1.3 million to acquire interests in four different wells in the TV Prospect as follows.  (*Id.*)

During an initial meeting in September 2006, Stewart was provided with a copy of an Operating Agreement, dated November 30, 2000, that governed the drilling and development operations of the TV Prospect, which at that time was being conducted by Bays Exploration, Inc. (Stewart Decl., Doc. No. 21-1, ¶ 4; Ex. A.)  Stewart claims that Ed Pendleton represented that this agreement was a "boilerplate" and "standard" agreement for this type of oil and gas investment.  (Stewart Decl. ¶ 4.)

Stewart first agreed to invest in a well in the TV Prospect known as the Tammy #1 Well.

(*Id.* ¶ 6.)  Pursuant to this investment, Stewart signed a contract entitled "Development

Agreement – Treasure Valley Prospect – Garvin and Murray Counties, Oklahoma," dated

September 7, 2006.[1]  (*Id.*, Ex. B ("Stewart Dev. Agmt.").)  The Development Agreement

contained the following arbitration provision:

> **Arbitration:**  Any dispute arising under this Agreement ("Arbitrable Dispute")
> shall be referred to and resolved by binding arbitration in Denver, Colorado, to be
> administered by and in accordance with the Commercial Arbitration Rules of the
> American Arbitration Association. Arbitration shall be initiated within the
> applicable time limits set forth in this Agreement and not thereafter or if no time
> limit is given, within the time period allowed by the applicable statute of
> limitations, by one Party ("Claimant") giving written notice to the other Party
> ("Respondent") and to the Denver Regional Office of the American Arbitration
> Association ("AAA"), that the Claimant elects to refer the Arbitrable Dispute to
> arbitration.  All arbitrators must be neutral parties who have never been officers,
> directors or employees of the parties or any of their Affiliates; must have not less
> than ten (10) years experience in the oil and gas industry, and must have a formal
> financial/accounting, engineering or legal education.  The hearing shall be
> commenced within thirty (30) Days after the selection of the arbitrator.  The
> Parties and the arbitrators shall proceed diligently and in good faith in order that
> the arbitral award shall be made as promptly as possible.  The interpretation,
> construction and effect of this Agreement shall be governed by the Laws of
> Colorado, and to the maximum extent allowed by law, in all arbitration
> proceedings the Laws of Colorado shall be applied, without regard to any
> conflicts of laws principles.  All statutes of limitation and of repose that would
> otherwise be applicable shall apply to any arbitration proceeding.  The tribunal
> shall not have the authority to grant or award indirect or consequential damages,
> punitive damages or exemplary damages.

(*Id.* § 12, ¶ J.)

In December 2006, Stewart invested in an additional well in the TV Prospect, known as

the Konlee Jae #1 well.  (Stewart Decl. ¶¶ 7-8.)  Pursuant to this investment, Stewart signed a

_____

[1] Stewart actually signed this Development Agreement a few days later on September 12,
2006.  (Stewart Decl., Ex. B.)

new contract on December 26, 2006 entitled "Amendment to the Development Agreement –
Treasure Valley Prospect." (Stewart Decl., Ex. C.) The Amendment specifically stated that it
was an amendment of the terms and conditions to the Development Agreement – Treasure
Valley Prospect dated September 7, 2006 between PenSa and James V. Stewart, LLC. (*See id.*)

In June 2007, Stewart elected to invest in two additional wells, known as the Ethel Lou
and Donna Sue wells. (Stewart Decl. ¶ 17.) Funds that Stewart had paid several months earlier
were applied to his share of the estimated drilling and completion costs of the Ethel Lou well,
and he paid the remainder of over $500,000 of his share on June 20, 2007. (*Id.*) Stewart also
paid an additional sum of $412,508 for his share of the drilling and completion costs of the
Donna Sue well in July 2007. (*Id.*)

Pursuant to this investment in the Ethel Lou and Donna Sue wells, Stewart signed a
contract on July 7, 2007 entitled "Letter of Understanding - Treasure Valley Prospect." (Stewart
Decl., Ex. J.) The Letter of Understanding specifically stated that "all the terms and conditions
of this Letter of Understanding is [sic] subject to the Development Agreement – Treasure Valley
Prospect – Garvin and Murray County, Oklahoma dated September 7, 2006 by and between
PenSa, Inc. and James V. Stewart, LLC." (*Id.*)

**B.      *Plaintiffs Mary and Richard Cook***

Based on their preexisting relationship with Ed Pendleton and his wife, Beverly
Pendleton, Mary and Richard Cook ("the Cooks") elected to proceed with an investment in the
TV Prospect. (Decl. of Richard Cook, Doc. No. 22-1, ¶ 15.) Ultimately, the Cooks invested
approximately $1.1 million to acquire interests in six wells in the TV Prospect as follows. (Cook
Resp. at 2.)

4

Similar to Stewart, during an initial meeting with Ed Pendleton in 2006, the Cooks were presented with a copy of the Operating Agreement.  (Cook Decl. ¶ 16.)  They were also advised that the Pendletons would be sending addition documents related to their potential investment in the TV Prospect.  (*Id.* ¶ 17.)

The Cooks initially agreed to invest in one well in the TV Prospect, known as the El Ray #1 well.  (Cook Decl. ¶ 17.)  Pursuant to this investment, the Cooks signed a contract entitled "Development Agreement – Treasure Valley Prospect, Garvin County, Oklahoma," dated March 6, 2006.[2]  (Cook Decl., Ex. B ["Cook Dev. Agmt. #1"].)  This Development Agreement contained an arbitration clause identical to the Development Agreement signed by Stewart.  (*Id.* § XII, ¶ J.)

Sometime after signing this Development Agreement, the Pendletons recommended, and the Cooks agreed, to split their initial investment between two different wells, rather than investing in a single well.  (Cook Decl. ¶ 20.)  Pursuant to this new investment, the Cooks signed a new contract entitled "Development Agreement - Treasure Valley Prospect - Garvin County, Oklahoma."  (Cook Decl., Ex. C ["Cook Dev. Agmt. #2"].)  While the new Development Agreement was dated March 6, 2006, the same date featured in the Cooks' original Development, the Cooks signed it on April 21, 2006.  (*See id.*)

Under this second Development Agreement, the "Contract Area" included the El Ray #1 well discussed above, as well as an additional well in the TV Prospect, known as the Hallee Blair

---

[2] The Cooks actually signed this Development Agreement a few days later, on March 12, 2006.  (*See* Cook Dev. Agmt. #1.)

#1 well.  (*See id.* at Ex. C.)  This second Development Agreement included an arbitration clause identical to the first Development Agreement signed by the Cooks.  (*Id.* § XII, ¶ J.)

In September 2006, the Cooks acquired an additional interest in a third well in the TV Prospect, known as the Tammy #1 well.  (Cook Decl. ¶ 28.)  Pursuant to this investment, the Cooks signed a new contract on September 12, 2006, entitled "Amendment to the Development Agreement – Treasure Valley Prospect – Garvin and Murray County, Oklahoma."  (Cook Decl., Ex. E.)  The Amendment specifically stated that it was an amendment of the terms and conditions to the Development Agreement – Treasure Valley Prospect dated March 6, 2006 between PenSa and the Cooks.  (*See id.*)

In December 2006, the Cooks acquired an addition interest in a fourth well in the TV Prospect, known as the Konlee Jae #1 well.  (Cook Decl. ¶ 32.)  Pursuant to this investment, the Cooks signed a contract on December 25, 2006, entitled "Amendment to the Development Agreement – Treasure Valley Prospect, Garvin and Murray County, Oklahoma."  (Cook Decl., Ex. F.)  As with the September 2006 Amendment, this Amendment specifically stated that it was an amendment of the terms and conditions to the Development Agreement – Treasure Valley Prospect dated March 6, 2006 between PenSa and the Cooks.  (*See id.*)

In January 2007, the Cooks were advised that their interest in the Konlee Jae #1 well had to be reduced "for reasons that have to do with leasehold issues."  (Cook Decl, ¶ 35.)  The Cooks were provided with a new agreement entitled "Amendment to the Development Agreement – Treasure Valley North Prospect, Garvin and Murray Counties, Oklahoma" that reflected a reduction in their interest in the Konlee Jae #1 well from 6.6% to 6.0%.  (Cook Decl, Ex. G.)  As with the prior Amendments, this Agreement specifically stated that it was an amendment of the

terms and conditions to the Development Agreement – Treasure Valley Prospect dated March 6, 2006 between PenSa and the Cooks.  (*See id.*)  The Cooks signed this agreement on February 16, 2007.  (*Id.*)

In June 2007, the Cooks acquired an additional interest in two more wells, the Ethel Lou and Donna Sue wells.  (Cook Decl. ¶ 45.)  Pursuant to this investment, on June 14, 2007, the Cooks signed a document entitled "Letter of Understanding – Treasure Valley Prospect."  (Cook Decl., Ex. K.)  That Letter of Understanding specifically stated that "all the terms and conditions of this Letter of Understanding is [sic] subject to the Development Agreement – Treasure Valley Prospect – Garvin and Murray County, Oklahoma dated March 6, 2006 by and between PenSa, Inc. and Mary and Richard Cook."  (*Id.*)

## C.    *Plaintiff Richard Hughes*

Plaintiff Richard Hughes ("Hughes") was solicited by the Pendletons and Ed Pendleton to invest in the TV-North Prospect.  (Hughes Resp. at 2.)  Altogether, Hughes ultimately invested a total of approximately $650,000 in connection with the TV-North Prospect as follows.  (*Id.*)

In April 2005, Hughes agreed to obtain an interest in the TV-North Prospect.  (Hughes Decl., Doc. No. 23-1, ¶ 13.)  Pursuant to this investment, Hughes signed a contract entitled "Development Agreement – Treasure Valley North Prospect – Garvin and Murray Counties, Oklahoma" dated April 18, 2005.[3]  (Hughes Decl., Ex. A ("Hughes Dev. Agmt.").)  Through this Development Agreement, Hughes obtained a "cost bearing beneficial interest" in the TV-North

---

[3] Hughes actually signed this Development Agreement a few days later, on April 25, 2005.  (*See* Hughes Dev. Agmt.)

Prospect.  (*Id.* § II, ¶ A.)  This Development Agreement contained an arbitration provision identical to the Development Agreements signed by Stewart and the Cooks.  (*Id.* § XII, ¶ J.)

Hughes was informed by the Pendletons the first well to be drilled in the TV North Prospect was the Laticia Lee #1 well.  (Hughes Decl. ¶ 13.)  Hughes participated in the drilling and completion of the initial test well for the Laticia Lee #1 well and submitted funds for his share of the costs for these operations.  (*Id.* ¶ 17.)

Due to a lack of return on his initial investment in the Laticia Lee #1, in December 2006, Hughes informed the PenSa that he did not want to participate in drilling on any future wells in the TV-North Prospect.  (*Id.* ¶¶ 19-20.)  To formalize Hughes' withdrawal from the TV-North Prospect, Hughes purportedly[4] executed a new document entitled "Letter of Understanding - Treasure Valley North Prospect."  (Hughes Decl., Ex. F.)  This Letter of Understanding provided that Hughes "relinquish[ed] and assign[ed] all of his rights, title, and intrest in and to the Contract Area (AMI) as described in the Development Agreement Treasure Valley North Prospect . . ., excepting the Laticia Lee #1 well . . . ."  (*Id.* at ¶ 1.)  The Letter of Understanding further provided that "Hughes shall be responsible for his share of any costs that are associated with the Laticia Lee #1 well per the Development Agreement Treasure Valley North Prospect Garvin and Murray Counties, Oklahoma dated April 18, 2005."  (*Id.* ¶ 4.)

**D.**    ***Plaintiff James Lust***

Plaintiff James Lust ("Lust") was solicited by the Pendletons and Ed Pendleton to acquire working interests in the Golden Trend Field, the Treasure Valley Prospect, and the Treasure

---

[4] The Letter of Understanding is not signed by Hughes.  (Hughes Decl., Ex. F.)

Valley North Prospect.  (Lust Resp. at 2.)  Altogether, Lust invested approximately $1.9 million

to acquire interests in six different wells in these prospects as follows.  (*Id.*)

First, in April 2003, Lust acquired a working interest in the J.A. Payne #1 well, located in

the Golden Trend Prospect, a prospect separate and apart from the TV and TV-North Prospects.

(Lust Decl., Doc. No. 25-1, ¶¶ 9-10.)  Pursuant to this investment, Lust signed a Letter

Agreement on April 27, 2006.  (Lust Decl., Ex. A.)  This Letter Agreement did not include an

arbitration clause.  (*See id.*)

In August 2003, Lust acquired a working interest in the TV Prospect (a/k/a Davis Field

Prospect).  (Lust Decl., ¶¶ 17-19.)  Lust initially obtained this working interest by signing a

"Letter of Understanding" on August 26, 2003.  (*Id.,* Ex. C.)  That Letter of Understanding

specifically provided that "[u]pon your acceptance of this Letter of Understanding a formal

Exploration and Development Agreement . . . will be forwarded to you for your acceptance and

signature and when executed will supercede this Letter of Understanding."  (*Id.* ¶ 8.)

Consistent with this language, Lust received a document entitled "Development

Agreement – Davis Field Project – Garvin County, Oklahoma" dated September 1, 2003. (Lust

Decl., Ex. E. ["Lust TV Prospect Dev. Agmt."].)  This Development Agreement contains an

arbitration clause identical to the Development Agreements executed by the other plaintiffs.  (*Id.*

§ XII ¶ J.)  Lust signed this Development Agreement on October 29, 2003.  (*See id.*)

Lust participated in four wells in the Treasure Valley Prospect:  the (1) Anderson #1 well;

(2) the El Ray #1 well; (3) the Hallee Blair #1; and (4) the Hallee Blair #1-Redrill well.  (Lust

Decl., ¶¶ 22-26.)

In April 2005, Lust acquired a "cost bearing beneficial interest" in the TV-North Prospect.  (*Id.* ¶ 27.)  Pursuant to this investment, Lust signed a contract on April 15, 2005, entitled "Development Agreement – Treasure Valley North Prospect – Garvin and Murray Counties, Oklahoma."  (Lust Decl., Ex. K ["Lust TV-North Dev. Agmt."].)  This Development Agreement included an arbitration clause identical to the Development Agreement he previously executed with respect to the TV Prospect.  (*Id.* § XII ¶ J.)  Lust participated in only one well in the TV-North Prospect, the Laticia Lee #1 well.  (Lust Decl. ¶ 28.)

Due to a lack of return on his investment, Lust notified PenSa he would no longer be participating in the TV and TV-North Prospects.  (*Id.* ¶ 29.)  To formalize this withdrawal from the TV and TV-North Prospects, Lust executed a new agreement entitled "Letter of Understanding - Treasure Valley Prospect & Treasure Valley North Prospect."  (Lust Decl., Ex. L.)  That Letter of Understanding provided that Lust "relinquish[ed] and assign[ed] all of his rights, title, and interest in and to the Contract Area (AMI) as described in the Development Agreement Davis Field Project  . . . dated September 1, 2003 and in the Development Agreement Treasure Valley North Prospect  . . . dated April 15, 2005" with the exception of the Anderson #1, Hallee Blair # 1, El Ray #1, and Laticia Lee #1 wells.  (*Id.* ¶ 1.)  The Letter of Understanding further provided that Lust would be responsible for his share of any costs that are associated with those four wells per the September 1, 2003 and April 15, 2005 Development Agreements.  (*Id.* ¶ 4.)

E.      ***The Bays Exploration Lawsuit***

In 2007, Bays Exploration, Inc. and Bays Energy Partners 2007, L.P. ("BEP") filed a lawsuit against PenSa in Oklahoma (the "Oklahoma Litigation").  (Am. Compl. ¶ 31.)  Plaintiffs

10

were not parties to that litigation.  Nevertheless, at Defendants' request, Plaintiffs executed letter agreements in which they generally acknowledged that PenSa maintained legal title to the subject property at issue in the Oklahoma Litigation; authorized PenSa to pursue, for the benefit of Plaintiffs, all defenses and claims applicable to Plaintiffs' interests in the properties; and agreed to be bound by any judgment entered at the conclusion of the Oklahoma Litigation.  (*Id.* ¶ 33, Ex. 6.)

In September 2012, the trial court in the Oklahoma Litigation entered judgment in favor of Bays Exploration and BEP against PenSa.  (*Id.* ¶ 51.)  In November 2012, PenSa entered into a Settlement Agreement in which Bays Exploration and BEP agreed to release PenSa from liability on the Oklahoma Litigation judgment in exchange for, among other things, PenSa's agreement to (i) assign all of its rights, titles, and interest in the Investment Prospects to Bays Exploration, (ii) disclaim any interest in any past or future production revenues attributable to its interest in the Investment Prospects.  (*Id.* ¶ 53.)  Plaintiffs allege that the Settlement Agreement extinguished all of their remaining equitable working interests in the Investment Prospects and their rights to any past or future production revenues associated with those interests.  (*Id.* ¶ 54.) Defendants allegedly did not consult with Plaintiffs prior to negotiating or executing the Settlement Agreement, nor did they inform Plaintiffs of the existence or terms of the Settlement after it had been executed.  (*Id.*¶ 55.)

In their Amended Complaint, filed January 21, 2014, Plaintiffs assert state law claims as follows:  breach of contract, breach of the duty of good faith and fair dealing; fraud; negligent misrepresentation; breach of fiduciary duty; constructive fraud; violations of the Colorado Securities Act, Colo. Rev. Stat. § 11-51-501 *et seq.*; taking of stolen property, pursuant to Colo.

Rev. Stat. § 18-4-405; conversion; violations of Oklahoma's Production Standards Act, 52 Okla Stat. §570.1 *et seq;* and alter ego liability against the Pendletons. (*See* Am. Compl.) Plaintiffs assert that the court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

Defendants' Motion to Compel Arbitration was filed on February 12, 2014. (*See* Mot Compel.) Defendants seek to compel arbitration based on the arbitration clauses included in the Development Agreements signed by Plaintiffs with respect to the Investment Prospects. Defendants also seek a stay of proceedings in this action pending completion of the arbitration.

## LEGAL STANDARD

### A.   *Magistrate Judge Authority*

As a threshold matter, the court addresses its authority under 28 U.S.C. § 636 with respect to Defendants' Motion to Compel Arbitration. A review of the case law reveals that district courts have reached different conclusions on whether motions to compel arbitration are dispositive for purposes of 28 U.S.C. § 636(b)(1). *See Vernon v. Qwest Comm'ns Int'l, Inc.,* 857 F. Supp. 2d 1136, 1140-41 (D. Colo. 2012) (comparing cases).

Unfortunately, the Tenth Circuit has not weighed in on this precise issue. Nevertheless, the court agrees with *Vernon* that *P & P Industries, Inc. v. Sutter Corp.,* 179 F.3d 861, 866-67 (10th Cir. 1999), provides some guidance. *Vernon,* 857 F. Supp. 2d at 1141. In *P & P Industries,* the Tenth Circuit held that a district court has the authority to confirm an arbitration award under Section 9 of the Federal Arbitration Act (FAA) where the parties "have agreed, explicitly or implicitly, that any eventual arbitration award shall be subject to judicial confirmation." *Id.* at 867; *see also Will v. Parsons Evergreene, LLC,* Case No. 08-cv-00898-DME-CBS, 2011 WL 2792398, at *1 (D. Colo. July 15, 2011)). Implicit consent may be

evidenced by the parties' agreement that the arbitration shall be governed by the rules and

procedures of the American Arbitration Association, as the AAA's rules "state that [p]arties to

these rules shall be deemed to have consented that judgment upon the arbitration award may be

entered in any federal or state court having jurisdiction thereof." *P & P Industries,* 179 F.3d at

867 (quoting AAA Rule 47(c).) [5]

Here, the parties have agreed that arbitration will be "administered by and in accordance

with the Commercial Arbitration Rules of the American Aribtration Association." (*See, e.g.,*

Stewart Dev. Agmt. § XII ¶ 12.)  Accordingly, the parties have implicitly consented to judicial

confirmation.

The Tenth Circuit has held that a motion may be considered dispositive for purposes of

28 U.S.C. § 636(b)(1) if it has an "identical effect" as one of the motions excepted in that statute.

*First Union Mortg. Corp. v. Smith,* 229 F.3d 992, 995 (10th Cir. 2000) (citing *Ocelot Oil Corp.*

*v. Sparrow Indus.,* 847 F.2d 1458, 1462 (10th Cir. 1988).  Measured by that standard, the court

finds that the instant Motion to Compel Arbitration is non-dispositive, as an Article III District

Judge ultimately will be required to confirm, modify, or vacate any arbitration award involving

the parties to this action.[6]  *Vernon,* 857 F. Supp. 2d at 1141 (quoting *Jackman v. Jackman,* Case

No. 06-1329-MLB-DWB, 2006 WL 3792109 (D. Kan. Dec. 21, 2006)) ("'because an Article III

---

[5] This language is now found at AAA Rule 52(c). *See* American Arbitration Association, www.adr.org (select "Search Rules" hyperlink under "Rules & Procedures" dropdown; then select "Commercial Arbitration Rules and Mediation Procedures") (last visited July 18, 2014).
[6] Should District Judge Raymond P. Moore reach a different conclusion as to the applicability of 28 U.S.C. § 636(b)(1)(A), this decision may be reviewed *de novo* pursuant to Fed. R. Civ. P. 72(b)(3).

judge will ultimately be required to confirm, modify, or vacate any arbitration award, the order to

stay proceedings and compel arbitration is non-dispositive and is within the magistrate's

authority.'").

**B.      Federal Arbitration Act**

The FAA requires a court to stay actions involving matters referable to arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon
> any issue referable to arbitration under an agreement in writing for such
> arbitration, the court in which such suit is pending, upon being satisfied that the
> issue involved in such suit or proceeding is referable to arbitration under such an
> agreement, shall on application of one of the parties stay the trial of the action
> until such arbitration has been had in accordance with the terms of the agreement
> . . . .

9 U.S.C. § 3.  The FAA further requires courts to compel arbitration in those cases.  *Id.* § 4.

The FAA "manifests a 'liberal federal policy favoring arbitration.'"  *Comanche Indian*

*Tribe v. 49, L.L.C.,* 391 F.3d 1129, 1131 (10th Cir. 2004) (quoting *Gilmer v. Interstate/Johnson*

*Lane Corp.,* 500 U.S. 20, 25 (1991)).  Thus, "as a matter of federal law, any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

However, when the parties dispute the existence of a valid arbitration agreement, there is

no presumption in favor of arbitration.  *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th

Cir. 2002).  "'[T]he question of arbitrability—whether a [contract] creates a duty for the parties

to arbitrate the particular grievance—is undeniably an issue for judicial determination.  Unless

the parties clearly and unmistakably provide otherwise, the question of whether the parties

agreed to arbitrate is to be decided by the court, not the arbitrator.'"  *Riley Mfg. Co., Inc. v.*

*Anchor Glass Container Corp.,* 157 F.3d 775, 779 (10th Cir. 1998) (quoting *AT&T Techs. v.*

14

*Comms. Workers,* 475 U.S. 643, 649 (1995)).  Thus, "[t]he existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997).

This district approaches disputes over whether the parties have agreed to arbitrate by applying "a standard similar to that governing motions for summary judgment." *Stein v. Burt-Kuni One, LLC,* 396 F. Supp. 2d. 1211, 1213 (D. Colo. 2005); *see also Goodwin v. H.M. Brown & Assocs., Inc.*, 10-cv-01205-PAB-MEH, 2011 WL 820025, at *3 (D. Colo. Mar. 2, 2011) (collecting cases); *In re Universal Serv. Fund Tel. Billing Practices Litigation,* 300 F. Supp. 2d 1107, 1116 (D. Kan. 2003) ("The Courts of Appeals have uniformly held that '[ i]n the context of motions to compel arbitration brought under the Federal Arbitration Act . . . courts apply a standard similar to that applicable to a motion for summary judgment.'")  Under this approach, Defendants bear the initial burden of presenting evidence sufficient to demonstrate that an enforceable arbitration agreement exists. *Stein,* 396 F. Supp. 2d at 1212.  If they satisfy that burden, the burden shifts to Plaintiffs, who must show that there is "a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Fed. R. Civ. P. 56." *Id.* at 1213.  Finally, the court must "look to state law principles of contract formation to [determine] whether an agreement to arbitrate has been reached." *Avedon Eng'g, Inc.* 126 F. 3d at 1287 (citations omitted).

## ANALYSIS

### A.      *Existence of an Enforceable Arbitration Clause*

The court first considers whether an enforceable arbitration clause exists.  At the outset, the court finds that each of the Plaintiffs signed Development Agreements that contain identical

arbitration clauses.  (*See* Stewart Dev. Agmt; Cook Dev. Agmt. #2; Hughes Dev. Agmt.; Lust

TV Prospect Dev. Agmt.; Lust TV-North Dev. Agmt.)  The court thus considers Plaintiffs'

arguments as to why these arbitration clauses are not enforceable with respect to some or all of

their claims.

> 1.      *Lust's Investment in the J.A. Payne Well*

Lust argues that the court cannot compel arbitration with respect to his initial investment

in the J.A. Payne well because the Letter Agreement he signed on April 27, 2006 did not include

any arbitration provision.  (Lust Resp. at 5.)  The court does not reach the question of whether it

can properly compel arbitration with respect to Lust's investment in the J.A. Payne well because

it finds that his investment in that well is not a subject of this action.

Federal Rule of Civil Procedure 8(a)(2) requires "short and plain statement of the claim

showing that the pleader is entitled to relief."  The purpose of the rule is to "give the defendant

fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v.

Twombly,* 550 U.S. 544, 555 (2007) (citation and internal punctuation omitted).

The court finds that the Amended Complaint fails to give Defendants notice that Lust's

claims are premised on his investment in the J.A. Payne Well.  The Amended Complaint does

not mention the J.A. Payne Well whatsoever.  (*See* Am. Compl.)  While it does states that "the

Pendletons solicited money from the Plaintiffs under a guise of an investment in various oil and

gas exploration projects," it explicitly mentions only "the Treasure Valley Prospect and Treasure

Valley North Prospect"  (*Id.* ¶ 13.)  Further, even assuming that vague term "various" could

conceivably encompass Lust's investment in the J.A. Payne Well, in alleging that their

investment agreements with PenSa were "memorialized by separate but virtually identical

Development Agreement relating to each Investment Prospect" (*id.* ¶ 21), Plaintiff cite to and attach only the Development Agreements for the TV Prospect and the TV North Prospect signed by Lust (*id.* Ex. 3-4).  Plaintiffs' Amended Complaint does not mention, cite, or attach the Letter Agreement concerning the J.A. Payne Well.

Notably, Plaintiffs first raised Lust's investment in the J.A. Payne Well, including the Letter Agreement establishing that investment, only after Defendants moved to compel arbitration based on the Development Agreements relating to Lust's and the other plaintiffs' investments in the TV and TV-North Prospects.  The court finds it likely that Plaintiffs did so only to "muddy the waters" as to whether it was appropriate to compel arbitration in this action.

Altogether, the court finds that the Amended Complaint does not give notice to Defendants that one of the bases for Lust's claims is his investment in the J.A. Payne Well. Therefore, the court finds that Lust's investment in the J.A. Payne well is not properly a basis for this action and, as a consequence, does not reach whether it may compel arbitration with respect to Lust's claims regarding that well.

## 2. *Lack of Consideration for Modification*

Lust also argues that the September 1, 2003 Development Agreement establishing his investment in the TV Prospect is unenforceable because it was a modification to the August 26, 2003 Letter of Understanding and was not supported by adequate consideration.  (Lust Resp. at 6-7.)  Although the court agrees that, generally, a modification to a contract requires consideration, s*ee, e.g., Hoagland v. Celebrity Homes, Inc.,* 572 P.2d 493, 494 (Colo. App. 1977), the court disagrees that the Development Agreement was a modification of the Letter of Understanding.  More specifically, the Letter of Understanding signed by Plaintiff Lust explicitly

provides that "[u]pon your acceptance of this Letter of Understanding a formal Exploration and Development Agreement . . . will be forwarded to you for your acceptance and signature and when executed will supercede this Letter of Understanding."  (Lust Decl., Ex. C ¶ 8.)  Thus, the Development Agreement was not a modification of the Letter of Understanding, but instead was contemplated and agreed upon as a term of the Letter of Understanding.

### 3.    Subsequent Agreements signed by Cook and Stewart

Stewart and the Cooks argue that arbitration can only be compelled to the extent their claims concern their initial investments that were obtained directly under the Development Agreements.  (Stewart Resp. at 12-13; Cooks Resp. at 11-12.)  The Cooks and Stewart argue that their other interests in the Investment Prospects were obtained under subsequent agreements that did not include an arbitration clause.

The court rejects this argument.  Although the Cooks and Stewart are correct that they each directly obtained an interest in only one well each by way of their respective Development Agreements, each of their subsequently-obtained interests were obtained through either (1) *amendments* to the original respective Development Agreements, rather than a new, self-standing agreement (*see* Stewart Decl., Ex. C; Cook Decl., Ex. F & G); or (2) a Letter of Understanding specifically stating that "all the terms and conditions of this Letter of Understanding is [sic] subject to the Development Agreement" between Stewart and PenSa (Stewart Decl., Ex. J).[7]  As

---

[7] Stewart argues that, although the 2007 Letter Agreement under which he acquired his interest in the Ethel Lou and Donna Sue wells incorporate the terms of the Development Agreement (Lust Decl., Ex. J), it was modification of two letter agreements dated May 30 and May 31, 2007 (*see* Lust Decl., Ex. I) and is unenforceable for lack of consideration because the May 2007 letters already required prepayment of funds to participate in the

such, the court finds that the Cook's and Stewart's subsequently-obtained interests are all subject to the terms of their respective Development Agreements, including the arbitration provisions.

### 4. Relinquishment Agreements of Hughes and Lust

Hughes and Lust both argue that the arbitration provisions contained in the Development Agreements they signed are not binding because the Development Agreements were superseded by the Letters of Understanding that relinquished their rights and obligations with respect to the Investment Prospects, with the exception of certain specified wells.  (Hughes Resp. at 5-8; Lust Resp. at 7-8.)  Lust and Hughes maintain that, with the exception of their obligations to be responsible for any costs associated with the wells that were not relinquished, the Letters of Understanding do not reference or incorporate any of the terms of the Development Agreements and, further, each letter explicitly provides that "should this Letter of Understanding conflict with any prior Agreement said Letter of Understanding shall prevail."  (Hughes Aff., Ex. F ¶¶ 4, 7; Lust Aff., Ex. L ¶¶ 4, 7.)

The court disagrees that the Letters of Understanding override the arbitration provision contained in the Development Agreements.  First, the Letter of Understanding attached to Hughes' declaration is <u>not</u> signed by Mr. Hughes, (*see* Hughes Decl., Ex. F), and there is no other evidence suggesting that this Letter of Understanding was ever executed (*see* Hughes Aff. ¶¶ 20-21.)  Because there is no evidence to suggest this Letter of Understanding ever became

_____

wells.  The court rejects this argument.  The May 2007 letter agreements only established Stewart's participation in the *drilling* of the Ethel Lou and Donna Sue Wells—they do not establish Stewarts' interest in those wells.  (*See* Lust Decl., Ex. I.)  The 2007 Letter Agreement is a separate agreement that is supported by consideration—namely the creation of Stewart's interest in the Ethel Lou and Donna Sue wells in exchange for his prepayment of the drilling costs.

effective, it cannot negate the arbitration provision contained in the Development Agreement signed by Hughes.

However, even if Hughes did sign the Letter of Understanding, as Lust did (*see* Lust Aff., Ex. L), these Letters of Understanding are insufficient to negate the arbitration provision contained in the Development Agreements. "Under the federal common law of arbitrability, an arbitration provision in a contract is held to survive the termination of that contract unless there is clear evidence that the parties intended to override this presumption." *Encore Productions, Inc. v. Promise Keepers,* 53 F. Supp. 2d 1101, 1108 (D. Colo. 1999) (citing *Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionary Workers Union,* 430 U.S. 243, 255 (1977); *Riley Mfg. Co.,* 157 F.3d at 781. "This presumption in favor of continuing arbitrability can be rebutted if the parties express or clearly imply an intent to repudiate arbitrability, or, if the dispute cannot be said to arise under the original contract." *Id.* at 1109.

In *Encore Productions,* the parties entered into a Service Contract that included an arbitration provision. *Id.* at 1106. However, approximately a year later, the parties entered into a Termination Agreement that purportedly terminated the original Service Contract in its entirety. *Id.* at 1107.

The court rejected the plaintiff's argument that the arbitration provision included in the Service Contract no longer held any force or effect in the face of the Termination Agreement. Instead, the court found that "even if the Termination Agreement effectively terminated the entire Service Contract, including its arbitration provision, 'when a dispute arises under an expired contract that contained a broad arbitration provision, courts must presume that the parties intended to arbitrate their dispute.'" *Id.* at 1108 (quoting *Riley Mfg.,* 157 F.3d at 781). Further,

20

the court did not find any evidence to rebut this presumption because the Termination Agreement had no express language regarding arbitration and there was no clear showing of an implied intent to repudiate the arbitration clause in the Service Contract. *Id.* at 1109.

Here, unlike in *Encore Productions,* it does not appear that the Letters of Understanding terminated the respective Development Agreements in their entirety.  Instead, the Letter Agreements both provide that Lust and Hughes retained both rights and obligations under the Development Agreements with respect to the wells for which they did not relinquish and assign their rights, titles and interests.  (*See* Lust Decl., Ex. L ¶¶ 1-5; Hughes Decl., Ex. F ¶¶ 1-5.)

In any event, the court finds that the Letters of Understanding do not contain any express or implicit language demonstrating that the parties intended to repudiate the arbitration clause contained in the Development Agreements.  Although the Letters of Understanding state "[s]hould this Letter of Understanding conflict with any prior Agreement said Letter of Understanding shall prevail"  (Lust Decl., Ex. L ¶ 4; Hughes Decl., Ex. F ¶ 4), it does not include any language or provision that actually conflicts with the Development Agreements or the arbitration clauses contained therein.  *See, e.g., United Steelworkers of Am. v. Warrior Gulf and Navigation Co.,* 363 U.S. 574, 585 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad.")  Furthermore, as discussed *supra,* the court finds Plaintiffs' claims in this matter "arise under" the Development Agreements.  Accordingly, the court finds that the Letters of Understanding signed by Lust and purportedly signed by Hughes did not supersede the arbitration provision contained in the original Development Agreements.

21

**5.      Unconscionability**

Plaintiffs all argue that the arbitration provisions contained in the respective

Development Agreements are unconscionable and therefore unenforceable.  The court disagrees.

Section 2 of the FAA provides that arbitration agreements are "valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract."  9 U.S.C. § 2.  Unconscionability is one such equitable consideration that may allow a

party to avoid its agreement to arbitrate.  *See AT&T Mobility LLC v. Concepcion*, --- U.S. ----,

131 S.Ct. 1740, 1745-48 (2011).  Under Colorado law, several factors inform the

unconscionability analysis, including,

> (1) a standardized agreement executed by parties of unequal bargaining power;
> (2) lack of opportunity to read or become familiar with the document before
> signing it; (3) use of fine print in the portion of the contract containing the
> provision; (4) absence of evidence that the provision was commercially
> reasonable; (5) the terms of the contract; (6) the relationship of the parties,
> including factors of assent, unfair surprise, and notice; and (7) all the
> circumstances surrounding the formation of the contract.

*Vernon v. Qwest Commc'ns Int'l, Inc.,* 925 F.Supp.2d 1185, 1194 (D.Colo.2013) (quoting *Davis*

*v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986)).  The burden is on Plaintiffs to prove that the

arbitration provisions contained in the Development Agreements are unconscionable.  *General*

*Steel Domestic Sales, LLC v. Rising Sun Missionary Baptist Church, Inc.*, Case No. 11-cv-

001332-DME-CBS, 2012 WL 1801955, at *2 (D. Colo. May 17, 2012).  Importantly, Plaintiffs

must demonstrate both procedural and substantive unconscionability.  *Vernon*, 925 F.Supp.2d at

1194–95.

The first, second, third, sixth, and seventh factors relate to procedural unconscionability.

As to the first factor, the court is not convinced that the Development Agreements were

standardized agreements presented on a take-it-or-leave-it basis.  Although the Development

Agreements may have been drafted by Defendants and presented to Plaintiffs for their signatures,

there is nothing in the record to suggest that the terms were completely nonnegotiable—at best, it

appears that Plaintiffs simply did not ask about them.[8]  *Weller v. HSBC Mortg. Servs, Inc.,* 971

F. Supp. 2d 1072, 1080-81 (D. Colo. 2013).  Moreover, although Defendants may have had more

experience than Plaintiffs in the oil and gas industry, Plaintiffs were not required to enter into the

Development Agreements with PenSa—they were always free to invest their money elsewhere.

*See Jones v. Dressel,* 623 P.2d 370, 375 (Colo. 1981) (no adhesion contract when services

provided by defendant could be obtained elsewhere); *Clinic Masters, Inc. v. District Court for*

*the Cnty. of El Paso,* 556 P.2d 473, (Colo. 1976) (fact that services could be purchased elsewhere

militates against finding of unconscionability).

  As to the second factor, there is no evidence to suggest that Plaintiffs lacked an

opportunity to read or become familiar with the Development Agreements before signing them.

To the contrary, each Development Agreement includes the following provisions:

> **L.**  **Construction, Captions: Definition of "Including":** The parties
> acknowledge that they have had an adequate opportunity to review each and every
> provision contained in this Agreement and to submit the same to legal counsel for
> review.  Based on said review and consultation, the Parties agree with each and
> every term contained in this Agreement
>   . . . .
> **N.**  **Investment Representations:**  . . .
>
> Prior to acquiring the interests, Second Party [i.e. Plaintiffs] have made an
> investigation of PenSa and its business and have had made available to Second
> Party all information with respect thereto which Second Party needed to make an

---

[8] In fact, a number of the Development Agreements contain handwritten notations, which
suggest that the Development Agreements may indeed have been negotiable.

informed decision acquire the interest.  Second Party considers itself to be an entity possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of Second Party's investment in the interest.

**O.     Independent Investigation**: Second Party represents that it is an experience and knowledgeable investor and operator in the oil and gas business, is aware of its risks, and is capable of independently evaluating the merits and risks of the investment contemplated by this Agreement.  Second Party acknowledges that as to the working interest being acquired hereunder, Second Party is acquiring all of the risks associated with oil and gas industry operations.

(*See* Am. Compl., Ex. 1-5 § L, N, & O, respectively.)  A party "generally cannot avoid contractual obligations by claiming that he or she did not read the agreement."  *Vernon,* 857 F. Supp. 2d at 1152.

As to the third factor, the arbitration provisions featured in the Development Agreements are featured in a separate paragraph with the bold-face title "**Arbitration**" and the text of the provision is in the same-sized font as the other clauses in the contract.  *See Rocky Mountain Chocolate Factory, Inc. v. SDMS, INc.,* No. 06-cv-01212-WYD-BNB, 2007 WL 4268962, at *7 (D. Colo. Nov. 30, 2007) (rejecting argument that provision was inconspicuous were it "was in normal print consistent with other clauses in the contract").

As to the sixth factor, Stewart and the Cooks argue that when the Pendletons provided them a copy of the Operating Agreement between Bays Exploration and PenSa—which does not include an arbitration provision and specifically contemplates that disputes be submitted to a court of law—they led Stewart and the Cooks to believe that contract would govern their investment in the Investment Prospects.  (Stewart Resp. at 9; Cooks Resp. at 7.)  This argument is unpersuasive.  First, Stewart and the Cooks never signed the Operating Agreement and did not agree to the Operating Agreement, except for through the Development Agreements.  More

24

importantly, Stewart and the Cooks both acknowledge that they ultimately acquired their working interests in the Investment Prospects through the Development Agreements. (*See* Stewart Decl., ¶ 6, Cook Decl. ¶ 17; Hughes Decl. ¶ 13.)

Stewart and Lust also argue that the volume of agreements they were required to sign with respect to the Investment Prospects warrants a finding of procedural unconscionability. (Stewart Resp. at 9-10; Lust Resp. at 9.)  However, as already discussed, there is no evidence to suggest that Stewart and Lust lacked an opportunity to review each of those agreements, including the Development Agreements.  Moreover, Plaintiffs have not submitted any case law to support the proposition, nor is the court otherwise persuaded, that the number of agreements a party is asked to sign, standing alone, equates to unfair surprise, or a lack of notice or assent. This is particularly true given that Plaintiffs each invested hundreds of thousands, if not millions, of dollars in the Investment Prospects over the course of these various contracts.  *See Bonanno v. Quizno's Franchise Co.,* No. 06-cv-02358-CMA-KLM, 2009 WL 1068744, at *22 (D. Colo. Apr. 20, 2009) (noting that, where there is a significant amount of money involved, "one would expect that plaintiffs entering into such a relationship would do so with a bit more cognizance than a teenager purchasing a phone at the mall").

The seventh factor is a "catchall that allows for consideration of all of the factors surrounding formation of the contract."  *Vernon,* 925 F. Supp. 2d at 1195.  For the reasons already discussed, the court has not identified any circumstances in the formation of the Development Agreements to render the arbitration clauses procedurally unconscionable.

Altogether, the court finds that Plaintiffs have failed to demonstrate that the Development Agreements in general, or the arbitration provisions in particular, were executed under

25

procedurally unconscionable circumstances. [9]   As such, the court finds Plaintiffs cannot avoid

arbitration based on unconscionability.

**B.      *Scope of the Arbitration Provision***

Plaintiffs argue that even if the arbitration clauses contained in the respective

Development Agreements are valid, some of their claims do not fall within the scope of that

provision and therefore are not subject to arbitration.  The court disagrees.

When a contract contains an arbitration clause, there is a general presumption of

arbitrability, and any doubts are to be resolved in favor of arbitration "unless it may be said with

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the

asserted dispute." *AT&T Techs,* 475 U.S. at 650.  Where the arbitration clause is broad, only an

express provision excluding a specific dispute, or "the most forceful evidence of a purpose to

exclude the claim from arbitration, will remove the dispute from consideration in arbitration."

*Id.*; *Cummings v. FedEx Ground Package Sys., Inc.,* 404 F.3d 1258, 1261 (10th Cir. 2005)

(quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d

Cir. 2001)) (when an arbitration clause is broad, "there arises a presumption of arbitrability and

arbitration of even a collateral matter will be ordered if the claim alleged implicate*s* issues of

contract construction or the parties' rights and obligations under it").

It does not appear that the Tenth Circuit has opined as to whether the language used in

the Development Agreements, i.e. "[a]ny dispute *arising under* this Agreement," (*See, e.g.,*

---

[9] Because a finding of unconscionability requires a showing of both procedural and substantive
unconscionability, the court does not address whether the arbitration provision is substantively
unconscionable.

Stewart Dev. Agmt. § XII, ¶ J (emphasis added)), warrants a broad or narrow construction. Other circuits have reached different results on the proper construction of the phrase "arising under."

In an early case, the Second Circuit stated that the phrase "'any dispute or difference [arising] under the Charter'" only applied to claims relating to the interpretation or performance of the contract. *In re Kinoshita & Co.,* 287 F.2d 951, 953 (2d Cir. 1961). The *Kinoshita* court reasoned that the phrase "arising under" is narrower in scope that the phrase "arising out of or relating to," the standard language recommended by the American Arbitration Association. *Id.* Similarly, the Ninth Circuit has equated the phrase "arising hereunder" with "arising under," and, relying on *Kinoshita,* found that the language "'arising hereunder' is intended to cover . . . only [disputes] relating to the interpretation and performance of the contract itself." *Mediterranean Enters. Inc. v. Ssangyon Corp.,* 708 F.2d 1458, 1464 (9th Cir. 1983); *see also Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292, 1294-95 (9th Cir. 1994) (reaffirming *Mediterranean Enterprises* narrow construction of "arising under").

However, the Second Circuit has subsequently changed course and, although not formally overruling *Kinoshita,* has severely confined its holding to the "its precise facts," noting that *Kinoshita* is inconsistent with the federal policy favoring arbitration. *See ACE Capital Re Overseas Ltd v. Cent. United Life Ins. Co.,* 307 F.3d 24, 33 (2d Cir. 2002) ("As a result of [later Second Circuit cases], the authority of *Kinoshita* is highly questionable in this Circuit"); *Louis Dreyfus Negoce,* 252 F.3d 218, 225-26 (2d Cir. 2001) ("In [*Kinoshita* ] . . . we intimated that the use of the phrase 'arising under' an agreement, in an arbitration clause, indicated that the parties intended the clause be narrowly applied. We have, however, since limited this holding to its

27

facts, declaring that absent further limitation, only the precise language in *Kinoshita* would

evince a narrow clause."); *S.A. Mineracao Da Trindade–Samitri v. Utah Int'l, Inc.*, 745 F.2d 190,

194 (2d Cir. 1984) ("We decline to overrule *In re Kinoshita*, despite its inconsistency with

federal policy favoring arbitration . . . because we are concerned that contracting parties may

have (in theory at least) relied on that case in their formulation of an arbitration provision.")

Accordingly, in these later cases, the Second Circuit found that language similar (but not

identical) to the language in *Kinoshita* warranted a broad construction.  *See, e.g., ACE Capital*,

307 F.3d at 31–34; *Genesco*, *Inc.*, 815 F.2d at 854; *S.A. Mineracao Da Trindade–Samitri*, 745

F.2d at 194–195.

      In addition, a majority of the other federal circuits have declined to follow *Kinoshita*

because of the strong federal policy in favor of arbitration.  *See, e.g., Battaglia v. McKendry*, 233

F.3d 720, 727 (3d Cir. 2000) ("[W]hen phrases such as 'arising under' and 'arising out of'

appear in arbitration provisions, they are normally given broad construction, and are generally

construed to encompass claims going to the formation of the underlying agreements."); *Gregory*

*v. Electro–Mech. Corp.*, 83 F.3d 382, 386 (11th Cir.1996) (broadly construing phrase "any

dispute . . . which may arise hereunder"); *Highlands Wellmont Health Network v. John Deere*

*Health Plan*, 350 F.3d 568, 578 (6th Cir. 2003) (holding "that 'arising out of' is broad enough to

include a claim of fraudulent inducement of a contract"); *Sweet Dreams Unlimited, Inc. v. Dial–*

*A–Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) (noting that "arising out of" covers all

disputes "having their origin or genesis in the contract, whether or not they implicate

interpretation or performance of the contract *per se*"); *Mar–Len of Louisiana, Inc. v. Parsons–*

*Gilbane*, 773 F.2d 633, 637 (5th Cir. 1985) (recognizing that *Kinoshita* is inconsistent with

federal policy favoring arbitration); *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.,* 638 F.3d 367, 381 (1st Cir. 2011) ("We agree with the majority of federal circuits . . . that the analysis in *Kinoshita* is not consistent with the strong federal pro-arbitration policy set forth by the FAA"). It appears that the Ninth Circuit is the only federal circuit that continues to strictly adhere to the analysis in *Kinoshita*.

The court believes the Tenth Circuit would follow the majority of the federal circuits and give the phrase "arising under" a broad construction based on the strong federal policy in favor of arbitration. *See Cummings,* 404 F.3d at 1262 (describing a "broad provision" as one that "refers all disputes arising out of a contract to arbitration"); *Viaero Wireless v. Nokia Solutions Network U.S. LLC,* Case No. 13-cv-00866-RM-CBS, 2013 WL 5366402, at *4-5 (D. Colo. Sept. 25, 2013) (relying on *Cummings* and giving a brad construction to provision of "any dispute under this Agreement . . ."). Accordingly, the court considers whether, under that broad construction, Plaintiffs' claims arise under the Development Agreements.

**C.    *Whether Plaintiffs' Claims "Arise Under" the Development Agreements***

Plaintiffs argue that some of their claims are outside of the scope of the Development Agreements. The court disagrees.

First, Plaintiff's first and second claims—for breach of contract and the implied duty of good faith and fair dealing—would be subject to arbitration even if the arbitration clause were *narrow* in scope. *See Mediterranean Enters. Inc.,* 708 F.2d at 1464 (narrow construction of "arising hereunder" covered disputes relating to the interpretation and performance of the contract itself).

Second, Plaintiff's third, fourth, and seventh claims—for fraud, negligent misrepresentation, and violations of the Colorado Securities Act, respectively—allege that Defendants made material misrepresentations that induced Plaintiffs to invest funds pursuant to the Development Agreements.  Courts have routinely held that a broad arbitration clause, such as the one here, covers claims for fraud in the inducement.  *See, e.g., Lee v. Grandcor Med. Sys., Inc.,* 702 F. Supp. 252 (D. Colo. 1988) (citing *Prima Paint Corp. v. Flood & Conklin Mfg.,* 388 U.S. 395 (1967); *Dialysis Access Ctr.,* 638 F.3d at 381 (collecting cases holding that a broad arbitration provision covers claims for fraud in the inducement).

The court finds that each of Plaintiffs' remaining claims arise under the Development Agreements because, at the very least, they relate to collateral matters that implicate construction of or the parties' rights and obligations under the Development Agreements.  *Cummings,* 404 F.3d at 1261.  More specifically, Plaintiffs' fifth and sixth claims, for breach of fiduciary duty and constructive fraud, respectively, both rely on duties created by, or collateral to, the Development Agreements.  Similarly, Plaintiffs' eighth, ninth, and tenth claims assert that Defendants took or misappropriated funds that Plaintiffs invested or were owed under the Development Agreements.

Accordingly, the court finds that each of Plaintiffs' claims "arise under" the Development Agreements.

## D.    *Arbitration of Claims against the Pendletons*

Finally, Plaintiffs argue that even if their claims against PenSa are properly submitted to arbitration, the court cannot compel arbitration against the Pendletons because they were not signatories to the Development Agreements.  The court disagrees.

30

It is true that courts typically have the authority to compel arbitration only between the signatories of an arbitration agreement.  *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001).  However, a nonparty may fall within the scope of an arbitration agreement under a theory of equitable estoppel where there is a "close relationship" between one of the signatories and the nonsignatory and a "signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  *Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.*, 176 F. Supp. 2d 1091, 1098 (D. Colo. 2011); s*ee also GATX Mgmt. Serv., LLC v. Weakland*, 171 F.Supp.2d 1159, 1166 (D. Colo. 2001).

Here, there is plainly a close relationship between PenSa and the Pendletons, the sole shareholders, directors, and employees of PenSa.  (Am. Compl. ¶ 12.)  In addition, Plaintiffs' claims do not distinguish between the actions of PenSa and the Pendletons.  Finally, Plaintiffs seek to attach any liability of PenSa to the Pendletons under an alter ego theory of liability.  (*Id.* ¶¶ 134-36.)  Accordingly, because Plaintiffs' allegations concern substantially (if not completely) interdependent misconduct between PenSa and the Pendletons, the court may and will compel Plaintiffs to arbitrate their claims against the Pendletons under a theory of equitable estoppel.

Therefore, for the foregoing reasons, it is

ORDERED that "Defendants' Motion and Brief to Compel Arbitration and Stay Proceedings" (Doc. No. 15) is GRANTED.  As soon as practicable the parties SHALL PROCEED to arbitration on Plaintiffs' claims asserted in this action.  It is further

ORDERED that this case is STAYED[10] pending the outcome of the arbitration of Plaintiffs' claims.  The parties shall file a Status Report no later than 14 days after completion of arbitration.

Dated this 1st day of August, 2014.

BY THE COURT:

_____
Kathleen M. Tafoya
United States Magistrate Judge

---

[10] The court notes that the District Court may elect to direct the Clerk of Court to administratively close this case, subject to reopening for good cause.  D.C.COLO.LCivR 41.2.